# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

KHUSEN KHUDAEV,

      Petitioner,

      v.                                      Case No. 2:25-cv-01291-KWR-JHR

TODD BLANCHE, *Acting United States Attorney General*, and
WARDEN, *Otero County Processing Center*,

      Respondents.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on *Pro Se* Petitioner Khusen Khudaev's Amended Petition for Writ of Habeas Corpus (Doc. 3). Petitioner is currently detained without access to a bond hearing. Prior to detention, he was on released from custody and reporting to U.S. Immigration and Customs Enforcement ("ICE"). Pet. at 3, Doc. 3; Doc. 9 at 3. He asserts that his mandatory detention violates the Immigration and Nationality Act ("INA") and his due process rights. Pet. at 10.

The Court referred the Petition to United States Magistrate Judge Jerry H. Ritter to provide proposed findings and a recommended disposition ("PFRD"). The Magistrate Judge recommended that the Court grant the Petition in part because his re-detention without proper parole revocation violated Petitioner's statutory and constitutional rights and Petitioner's detention was governed by 8 U.S.C. § 1226(a), not 8 U.S.C. § 1225(b). Doc. 27. Respondents objected to the PFRD.

The Court adopts in part and rejects in part the Magistrate Judge's recommendation. The Court concludes that Petitioner is entitled to release under his due process claim because Respondents detained Petitioner without properly terminating his parole. The Court further finds

that Petitioner's detention is governed by § 1226 because the U.S. Department of Homeland Security ("DHS") treated Petitioner as subject to § 1226(a) in 2021. Therefore, having reviewed the parties' pleadings, briefing, and the relevant law, the Court finds that the Petition is well-taken and therefore is **GRANTED in part.** The Court orders Respondents to immediately release Petitioner. Should Petitioner be later re-detained following proper parole termination, his detention would be subject to the discretionary detention procedures required under § 1226(a).

## BACKGROUND

### I.  Factual Allegations.

Petitioner is a citizen of Uzbekistan currently detained at the Otero County Processing Center in New Mexico. Pet. at 2–3. In December 2021, Border Patrol officers encountered and arrested Petitioner near the United States–Mexico border in Yuma, Arizona. Doc. 9-1 (2021 Form I-213); Doc. 9 at 3 (Response). Petitioner admitted to unlawfully entering the United States from Mexico. Doc. 9-1. On December 28, 2021, Petitioner was issued a Notice to Appear ("NTA") designating him as a noncitizen "present in the United States who has not been admitted or paroled." Doc. 9-2 (2021 NTA). DHS then released Petitioner "on his own recognizance (NTA-OR) for humanitarian reasons." Doc. 9 at 3; Doc. 9-3 (2025 Form I-213). Upon his release, Petitioner was enrolled in the alternative to detention program. ("ATD"). Doc. 9 at 3. Petitioner applied for asylum in 2022. Doc. 9-5 (2022 ASC Appointment Notice). And it appears that the 2021 NTA was never filed because an immigration court later found that DHS failed to prosecute the removal. Doc. 9 at 3.

Although the record is incomplete between 2022 and 2025, the 2025 Form I-213 indicates that ATD was terminated in 2023 for non-compliance. Doc. 9-3 at 3. In 2024, Petitioner was

"processed as Paroled" by Border Patrol officers. *Id.* at 5. Petitioner states that he had been reporting to ICE and had not committed any crimes. Pet. at 3.

On July 15, 2025, Petitioner was stopped at a border patrol checkpoint while driving a commercial vehicle with his brother in the passenger seat. Doc. 9-3 at 1–2. Both occupants presented proof of employment authorization but did not possess any other proof of immigration status. *Id.* at 2. As a result, both occupants were referred to secondary inspection. *Id.* at 2. Following a records check, Petitioner was detained while his brother was released. *Id.* at 4.

The next day, DHS served Petitioner with a notice and order of expedited removal pursuant to 8 U.S.C. § 1225(b)(1), which found him to be inadmissible and ordered him removed. Doc. 9-8 (Notice and Order of Expedited Removal). At the same time, Petitioner was presented with several other documents. Doc. 9-9 (Notice to Alien Ordered Removed/Departure Verification); Doc. 9-10 (Warning as to Rights); Doc. 9-11 (Title 18 United States Code, Section 1001); Doc. 9-12 (USBP Consent to Search Form for Telephone).

In November 2025, DHS informed Petitioner that, because of the expedited removal proceedings against him, DHS could consider his Form I-589 seeking asylum. Doc. 9-13. The notification still allowed him to receive a credible fear interview by an asylum officer. *Id.* At his interview, the officer found that Petitioner established a credible fear of persecution or torture. Doc. 11 at 2. The parties have not informed the Court about the outcome of any resulting proceedings regarding Petitioner's asylum application or removal status.

## II.     **The Habeas Petition**.

Petitioner asserted claims for violation of the INA and his substantive and procedural due process rights.[1] Among other things, Petitioner contends that he is unlawfully detained because, following *Matter of Yajure Hurtado*, 29 I. & N. Dec. 216 (B.I.A. 2025), noncitizens are being wrongfully detained under 8 U.S.C. § 1225(b)(2) "without any individualized consideration for whether they should be detained." Pet. at 7.

Petitioner pointed to his release status in his Petition but did not expressly assert that his lack of notice violated his due process rights. However, after the Magistrate Judge ordered supplemental briefing on the issue of "inspection," both parties raised Petitioner's parole and its termination to support their arguments. *See* Doc. 23 at 2 (Respondents' Supplemental Briefing); Doc. 26 at 1–3 (Petitioner's Response). As such, the Court finds that the parole termination issue is sufficiently raised since Petitioner is proceeding *pro se*. *Riddle v. Mondragon*, 83 F.3d 1197, 1202 (10th Cir. 1996) ("If the plaintiff proceeds *pro se,* the court should construe his pleadings liberally and hold the pleadings to a less stringent standard than formal pleadings drafted by lawyers.").

**LEGAL STANDARDS**

I.      **Habeas Law.**

Petitioner seeks release from detention under a habeas statute, 28 U.S.C. § 2241. The Constitution guarantees that "absent suspension, the writ of habeas corpus remains available to every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (citing U.S. Const. art. I, § 9, cl. 2). A federal court may grant a writ of habeas corpus to a petitioner who demonstrates that he is in custody in violation of the Constitution or federal law. § 2241(c)(3).

---

[1] Petitioner also sought attorney's fees and costs under the Equal Access to Justice Act. The Court will not consider this request as Petitioner is proceeding *pro se*.

"Challenges to immigration detention are properly brought directly through habeas." *Soberanes v. Comfort*, 388 F.3d 1305, 1310 (10th Cir. 2004) (citing *Zadvydas v. Davis*, 533 U.S. 678, 687–88 (2001).

**II.    Standard of Review for Proposed Findings and Recommended Disposition.**

This matter is before the Court on the Magistrate Judge's PFRD. "The filing of objections to a magistrate's report enables the district judge to focus attention on those issues—factual and legal—that are at the heart of the parties' dispute." *United States v. One Parcel*, 73 F.3d 1057, 1059 (10th Cir. 1996) (quoting *Thomas v. Arn*, 474 U.S. 140, 147 (1985)). The Tenth Circuit has adopted a firm waiver rule, where the failure to make timely and specific objections to a PFRD waives both district court and appellate review. *Id.* at 1060. The Court reviews the record relevant to the objections *de novo*. *Id.*

An objection must be sufficiently specific to focus the district court's attention on the factual and legal issues that are truly in dispute. *Id.* at 1059–60. By contrast, an objection that is "nonspecific, too general, and fails to meaningfully address the PFRD's ultimate holding or its underlying findings and conclusions" may be deemed waived. *Leal v. United States*, No. 1:22-cv-761-JB-JFR, 2023 WL 6360864, at *4 (D.N.M. Sept. 29, 2023); *see also Shepherd v. Rios*, No. 5:17-cv-427-HE, 2018 WL 1866111, at *1 (W.D. Okla. Apr. 18, 2018) (deeming waived objection that "d[id] not attempt to come to grips with the [PFRD's] analysis or conclusions in any specific way, [but] rel[ied] for the most part on re-adopting . . . earlier arguments"). Failure to file specific objections waives *de novo* review by the district court. *See One Parcel*, 73 F.3d at 1060–61.

**DISCUSSION**

Respondents have filed six objections to the PFRD. They object to the Magistrate Judge's recommendation that (1) Petitioner's brief 2021 detention was pursuant to § 1225(b)(2) because

5

he did not meet the statutory requirements of § 1225(b)(1); (2) Petitioner's parole means that Petitioner's detention is governed by § 1225(b)(2); (3) it was the Respondents' position that "inspection" is necessary for § 1225(b)(2) detention; (4) an "inspection" may occur outside approved ports of entry; (5) re-detention violated Petitioner's statutory rights; and (6) re-detention violated Petitioner's right to due process.

The Court begins its review with Petitioner's due process claim that, according to the PFRD, justifies Petitioner's release. Next, the Court addresses the statutory authority that governs (and would later govern) Petitioner's detention should Respondents re-detain Petitioner following his release.

**I.**     **<u>Respondents violated Petitioner's due process rights by failing to terminate his parole prior to detention.</u>**

According to the Magistrate Judge, the Petitioner was entitled to release because Respondents failed to properly terminate his parole before detention. Doc. 27 at 16. The Court begins its analysis here and overrules the Respondents' sixth objection to the PFRD.

Applicants for admission may be released on parole on a "case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). The noncitizen must be returned to the custody he was in "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served." *Id.* Parole automatically terminates when the parole period expires or when the noncitizen departs the United States. 8 C.F.R. § 212.5(e)(1) (2026). If parole does not automatically terminate, then if the purpose for the parole is accomplished or a designated official determines that "neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, parole shall be terminated *upon written notice* to the alien." *Id.* § 212.5(e)(2)(i) (emphasis added). Parole "shall not be

regarded as an admission of the alien." *Jennings v. Rodriguez*, 583 U.S. 281, 288 (2018) (quoting § 1182(d)(5)). Accordingly, a parolee's due process rights do not extend beyond the procedures authorized by Congress. *Sierra v. Immigr. & Naturalization Serv.*, 258 F.3d 1213, 1218 (10th Cir. 2001); *see also Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139 (2020).

As explained below, because Petitioner's parole was terminated before expiration or departure, Congress required Respondents to provide him with adequate notice. Since Petitioner was not provided with such notice, the Court finds that Respondents' actions violated Petitioner's constitutional right to procedural due process.

### A.     Congress authorized the notice required under 8 C.F.R. § 212.5.

The Court interprets § 1182 to require written notice to a noncitizen if the government terminates their parole before expiration or departure. For more than fifty years, Congress's actions have implicitly authorized the procedures outlined in § 212.5.

After *Loper Bright Enterprises v. Raimondo*, the Court's task is to independently evaluate a statute, while giving agency interpretations "due respect," but not binding deference. 603 U.S. 369, 403 (2024). Given that § 1182 does not definitively indicate that notice is required, the Court considers relevant regulations to the extent that they possess the power to persuade. *See id.* at 370 ("'The weight of such a judgment in a particular case,' the Court observed, would 'depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944))).

In construing the statute at issue, the Court begins with its plain text. *See Chickasaw Nation v. United States*, 208 F.3d 871, 876 (10th Cir. 2000). "If the terms of the statute are clear and unambiguous, they are controlling absent rare and exceptional circumstances." *Id*. In ascertaining

the meaning of the text, the Court considers the "language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997); *see also Conrad v. Phone Directories Co.*, 585 F.3d 1376, 1381 (10th Cir. 2009) ("We also take into account the broader context of the statute as a whole when ascertaining the meaning of a particular provision."). The Court also considers traditional canons of statutory interpretation. *Conrad*, 585 F.3d at 1381; *Ramah Navajo Chapter v. Salazar*, 644 F.3d 1054, 1062 (10th Cir. 2011). Generally, the Court only considers non-textual evidence bearing on Congress's intent or purpose, such as legislative history, if statutory language is ambiguous. *See, e.g.*, *United States v. Husted*, 545 F.3d 1240, 1247 (10th Cir. 2008).

Here, §1182 does not explicitly require that notice be given to a noncitizen when the government decides to terminate parole before its expiration. According to § 1182(d)(5)(A):

> The Secretary of Homeland Security may . . . in his discretion parole into the United States temporarily under such conditions as he may prescribe *only on a case-by-case basis for urgent humanitarian reasons or significant public benefit* any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and *when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served* the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

§ 1182(d)(5)(A) (emphasis added). The phrase "case-by-case basis" means that the grant of parole should be granted on an individual basis. *See Case-by-Case*, Oxford English Dictionary, https://www.oed.com/dictionary/case-by-case_adv#326800067 (last visited June 1, 2026) ("That

considers or deals with each case separately, taking into account its individual circumstances and features."). The phrase "for urgent humanitarian reasons or significant public benefit" indicates that parole may only be granted under specific circumstances. And the phrase "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served" requires DHS to determine whether the purpose of a noncitizen's parole has been served, those circumstances no longer apply, and termination is appropriate.  Taken together, these phrases indicate that some sort of process is required to notify a noncitizen present in the United States that, because the purpose of their parole has been served, DHS has decided to terminate their parole before its expiration. But the language of § 1182(d)(5)(A) is ambiguous because it does not prescribe what procedure is required. Therefore, the Court will consider non-textual evidence as to Congress's intent. *See Husted*, 545 F.3d at 1247.

The corresponding regulation to § 1182(d)(5)(a), 8. C.F.R. § 212.5(e), outlines certain procedures related to notice:

(2)(i) On notice. In cases [where a noncitizen does not depart and parole has not expired], upon accomplishment of the purpose for which parole was authorized or when in the opinion of one of the officials listed in paragraph (a) of this section, neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, *parole shall be terminated upon written notice to the alien* and he or she shall be restored to the status that he or she had at the time of parole. When a charging document is served on the alien, the charging document will constitute written notice of termination of parole, unless otherwise specified. Any further inspection or hearing shall be conducted under section 235 or 240 of

the Act and this chapter, or any order of exclusion, deportation, or removal previously entered shall be executed.

8 C.F.R. § 212.5(e)(2)(i). Accordingly, § 212.5(e) specifies that written notice of the termination of parole is required except where the noncitizen has departed or when the specified period of parole has expired.  A "charging document" can serve as proper notice of parole termination unless the document says otherwise. *Id.* The term charging document is defined by regulation as "the written instrument which initiates a proceeding before an Immigration Judge." 8 C.F.R. § 244.1 (2026).

A notice requirement has existed since § 212.5's promulgation in 1975. Initially, § 212.5 required that notice be given once parole was terminated, regardless of the circumstances. Parole Into United States of Aliens, 40 Fed. Reg. 49767, 49767 (Oct. 24, 1975). In 1981, the regulation narrowed the notice requirement by exempting notice when parole terminated upon departure or expiration. Termination of Parole, 46 Fed. Reg. 24929, 24929–30 (May 4, 1981). Since then, the written notice requirement has remained largely unchanged. *Compare* § 212.5(b) (1982), *with* § 212.5(e) (2026).

Meanwhile, Congress has amended § 1182(d)(5)(A) multiple times. Significantly, Congress changed how parole may be granted when it enacted the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") thirty years ago. In the IIRIRA, Congress replaced "for emergent reasons or for reasons deemed strictly in the public interest" with "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." Pub. L. No. 104-208, div. C, § 602, 110 Stat. 3009, 3009-689 (1996). Yet Congress did not further amend § 1182(d)(5)(A), despite its presumed awareness that the agency interpreted § 1182 to require notice. *See Lorillard v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of an administrative or

10

judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change").

In 1997, § 212.5 was amended to conform with the IIRIRA. Inspection and Expedited Removal of Aliens, 62 Fed. Reg. 10312, 10313 (Mar. 6, 1997). At the same time, § 212.5 added that a charging document may serve as notice of parole termination, *see id.* at 10349, along with the definition of a "charging document, *see id.* at 10332. Section 212.5 has been amended only once more to clarify that delegated officials have the authority to grant parole. 65 Fed. Reg. 82254, 82254 (Dec. 28, 2000). Otherwise, the language of § 212.5 has remained the same for almost thirty years.

Since the enactment of the IIRIRA, Congress has amended § 1182(d)(5)(A) only once to state that the Secretary of Homeland Security, rather than the Attorney General, has the authority to grant and terminate parole. *See* Laken Riley Act, Pub. L. 119-1, § 3, 139 Stat. 3, 4 (2025).

Considering the above, the Court finds that Congress has authorized and incorporated the notice procedures required by § 212.5. The regulation has recognized that § 1182 requires notice under certain circumstances for well over fifty years, and Congress must have been aware that the agency interpreted § 1182 to require notice. *See Lorillard*, 434 U.S. at 580. Yet, Congress did not materially change § 1182(d)(5)(A), even as it amended the circumstances under which parole may be granted. *See Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 722 (2018) ("When Congress used the materially same language in [the statute], it presumptively was aware of the longstanding [administrative] interpretation of the phrase and intended for it to retain its established meaning."). Thus, the Court is persuaded that § 212.5 reflects Congress's intent and interpretation of § 1182(d)(5)(A) as it relates to the written notice requirement.

11

**B.    Petitioner did not receive adequate written notice terminating his parole.**

In 2024, Petitioner was "processed as Paroled" by Border Patrol officers. Doc. 9-3 at 5. Respondents do not dispute that Petitioner was released on § 1182 parole when he was detained in July 2025 and that his parole had not been terminated prior to his arrest and detention. Doc. 27 at 3, 7, 9. Rather, they object to the Magistrate Judge's recommendation because Petitioner is only entitled to what is authorized by Congress and, from the Respondents' point of view, the administration's actions did not run afoul of § 1182. Doc. 28 at 9–10. Further, they object to the Magistrate Judge's determination that the documents provided to Petitioner after he was arrested did not properly terminate his parole. *Id.*

As discussed above, § 1182 authorizes the notice procedures outlined in § 212.5. Petitioner did not leave the United States. Respondents do not assert that Petitioner's parole expired, so the Court assumes that Petitioner's parole has not reached its expiration date. Thus, notice was required in accordance with § 212.5(e)(2)(i).

Respondents argue that Petitioner's 2021 NTA and the documents "containing charging information" are sufficient evidence that Petitioner's parole was terminated. Doc. 28 at 9. The Court disagrees. None of these documents included language notifying Petitioner that his parole was terminated, and none of them were charging documents. Thus, Petitioner's parole was not terminated "upon written notice" as required by § 212.5(e)(2)(i).

First, the 2021 NTA cannot serve as notice of Petitioner's parole termination. Section 212.5(e)(2)(i) provides that "[w]hen a charging document is served on the alien, the charging document will constitute written notice of termination of parole, unless otherwise specified." A "charging document" is defined as a "written instrument which initiates a proceeding before an Immigration Judge." 8 C.F.R. § 244.1 (2026). As applied to Petitioner, these documents include "a

Notice to Appear, a Notice of Referral to Immigration Judge, and a Notice of Intention to Rescind and Request for Hearing by Alien." *Id.* Petitioner received an NTA when he entered the country in December 2021. Doc. 9-2. But a charging document served almost three years before parole is granted would render the notice requirement a nullity. Thus, the 2021 NTA did not qualify as notice under § 212.5.

Next, sufficient notice was not given to Petitioner following his arrest. Respondents rely on the documents served on Petitioner just after his arrest: a Notice and Order of Expedited Removal (Doc. 9-8), a Notice to Alien Ordered Removed/Departure Verification (Doc. 9-9), a Warning as to Rights (Doc. 9-10), a Title 18 United States Code, Section 1001 form related to false statements (Doc. 9-11), a USBP Consent to Search Form for Telephones (Doc. 9-12), and a Notice of Dismissal of Form I-589 as to Petitioner's asylum application (Doc. 9-13). These documents do not include language notifying Petitioner that his parole was terminated. Nor did they meet the definition of charging documents.

Looking to the Notice and Order of Expedited Removal (Doc. 9-8), again, a charging document initiates a proceeding before an immigration judge. In using the word "including" in § 212.5, the agency meant to provide a non-exhaustive list of charging documents. But the definition of a charging document is clear, and a notice and order of expedited removal pursuant to INA section 235 (codified at § 1225(b)(1)) does not meet it. A notice and order of expedited removal does not initiate a proceeding before an immigration judge. Under § 1225(b)(1), expedited removal does not allow for "any further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution." § 1225(b)(1)(A)(i); *see also United States v. Gonzalez-Fierro*, 949 F.3d 512, 514 (10th Cir. 2020) ("Different from formal removals, expedited removals are streamlined—generally there is no hearing, no administrative

13

appeal, and no judicial review before an expedited removal order is executed."); *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin*, --- F.4th ----, No. 25-5243, 2026 WL 1110616, at *3 (D.C. Cir. Apr. 24, 2026). Should a noncitizen indicate that they wish to seek asylum, the statute states that an "asylum officer" will conduct an interview. § 1225(b)(1)(B). An asylum officer is not an immigration judge. *See id.* § 1225(b)(1)(E). Thus, a notice and order of expedited removal was not a charging document and could not serve as proper notice of parole termination.

The Court reaches the same conclusion regarding the other documents served to Petitioner just after his arrest in July 2025. The Notice to Alien Ordered Removed/Departure Verification notified Petitioner that he could not enter or attempt to enter the United States for five years after departure. Doc. 9-9. The Warning as to Rights notified Petitioner of his *Miranda* rights during the interview. Doc. 9-10. The Title 18 United States Code, Section 1001 form notified Petitioner that he could be punished for making false statements. Doc. 9-11. The USBP Consent to Search Form for Telephones allowed Petitioner to give USBP agents consent to search his cellphone. Doc. 9-12. Because the July 2025 documents did not notify Petitioner that his parole was terminated or initiate a proceeding before an immigration judge. As to the Notice of Dismissal of Form I-589, it was sent more than three months after Petitioner was detained. Doc. 9-13. And it only notified Petitioner that the asylum office could not process his application because he was placed in expedited removal proceedings and stated that Petitioner could still request a credible fear interview with an asylum officer. *Id.* Accordingly, these documents could not satisfy the notice requirement under section 212.5. Therefore, the Court finds no indication that Petitioner received any charging document that sufficiently qualified as written notice terminating his parole.

In sum, because there is no evidence that any written notice was sent to Petitioner before July 15, 2025, and no documents provided sufficient notice upon his arrest, his parole was not

properly terminated. The Court finds that Respondents failed to follow the applicable procedural requirements to terminate Petitioner's parole pursuant to § 1182(d)(5)(A) and § 212.5.

**C.     Respondents' failure to provide notice violates Petitioner's procedural due process rights.**

Respondents contend that Petitioner's received the process he was due under the Constitution because DHS's actions complied with § 212.5. Doc. 28 at 10. The Court disagrees and finds that the actions violated Petitioner's violated his due process rights.

The Due Process Clause prohibits the federal government from depriving any person "of life, liberty, or property, without due process of law." U.S. Const. amend. V. Under the Fifth Amendment, noncitizens are entitled to due process "in the context of removal proceedings." *Trump v. J.G.G.*, 604 U.S. 670, 673 (2025) (citing *Reno v. Flores*, 507 U.S. 292, 306 (1993)). Thus, immigration detainees pending removal "are entitled to notice and opportunity to be heard 'appropriate to the nature of the case.'" *Id.* (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950)).

A noncitizen, subject to removal, is "entitled only to the Fifth Amendment guarantee of fundamental fairness." *Schroeck v. Gonzales*, 429 F.3d 947, 952 (10th Cir. 2005). Because noncitizens "do not have a constitutional right to enter or remain in the United States, the only protections afforded are the minimal procedural due process rights for an opportunity to be heard at a meaningful time and in a meaningful manner." *Sosa-Valenzuela v. Holder*, 692 F.3d 1103, 1112 (10th Cir. 2012). Beyond this minimal procedural safeguard, "any alleged liberty interest [in discretionary immigration relief] must be created by statute or regulation." *Id.* (quoting *Arambula-Medina v. Holder*, 572 F.3d 824, 828 (10th Cir. 2009)). In immigration proceedings, "a petitioner has no liberty or property interest in obtaining purely discretionary relief."

15

*Arambula-Medina*, 572 F.3d at 828 (citation omitted). For a statute or regulation to create a liberty interest, it "must substantively limit the exercise of official discretion through specifically defined criteria that guide official decision making." *Sosa-Valenzuela*, 692 F.3d at 1112 (citing *Aguilera v. Kirkpatrick*, 241 F.3d 1286, 1293 (10th Cir. 2001)).

Courts considering due process claims consider whether there exists a protected liberty interest and whether the procedures provided afford the individual adequate process. *Camuglia v. City of Albuquerque*, 448 F.3d 1214, 1219 (10th Cir. 2006); *see also Aguilar-Aguilar v. Napolitano*, 700 F.3d 1238, 1244 (10th Cir. 2012) ("To claim a violation of his right to procedural due process, Petitioner 'must have a liberty or property interest in the outcome of the proceedings.'" (quoting *Arambula-Medina*, 572 F.3d at 828)).

### 1. The regulation affords Petitioner a sufficient liberty interest.

Here, the relevant regulation provides that "upon accomplishment of the purpose for which parole was authorized or when in the opinion of [a designated official], neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, parole shall be terminated upon written notice to the alien." 8 C.F.R. § 212.5(e)(2)(i). Petitioner, as a result of being paroled into the United States, is "legally considered to be detained at the border and hence as never having effected entry into this country." *Sierra v. Immigr. & Naturalization Serv.*, 258 F.3d 1213, 1218 (10th Cir. 2001); *see also Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139 (2020) ("[A]liens who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are 'treated' for due process purposes 'as if stopped at the border.'" (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215 (1953)). Therefore, the only due process rights afforded to Petitioner are the "minimal procedural due process rights for an opportunity to be heard at a meaningful time and in a meaningful manner."

16

*Sosa-Valenzuela*, 692 F.3d at 1112. Beyond this procedural minimum, to create a liberty interest, a statute or regulation must "substantively limit the exercise of official discretion through specifically defined criteria that limit decision making." *Id.*

8 C.F.R. § 212.5(e) specifically limits termination of parole to two situations: (1) under § 212.5(e)(1), automatic termination "without written notice"; and (2) under § 212.5(e)(2)(i), "[i]n cases not covered by paragraph (e)(1)," on written notice. Petitioner's parole was not automatically terminated because he did not depart the United States, and Respondents acknowledge that Petitioner's parole had not terminated before his arrest. So, in accordance with § 212.5(e)(2)(i), Petitioner's parole needed to be terminated "upon accomplishment of the purpose for which parole was authorized," or when, in the opinion of a designated official, "neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States." In addition to these substantive limits on the official discretion to terminate Petitioner's parole, the regulation requires that the parole "be terminated upon written notice to the alien." *Id.*

Petitioner and Respondents provide no indication, such as an email or declaration, that written notice was ever sent to Petitioner. Since § 212.5(e)(2)(i) includes criteria that limit the official's decision to terminate parole, Petitioner had a liberty interest in receiving written notice that explains the basis for his parole's termination in accordance with the terms provided by Congress. *See United States v. Gonzalez-Fierro*, 949 F.3d 512, 520 (10th Cir. 2020) ("[T]he Supreme Court has ruled that when Congress enacts a procedure, aliens are entitled to it." (quoting *United States v. Barajas-Alvarado*, 655 F.3d 1077, 1084–85 (9th Cir. 2011))); *see also United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950) ("Whatever the procedure authorized by Congress is, it is due process as far as an alien is concerned."). Therefore, having determined that Petitioner had a sufficient liberty interest created by the regulation, the Court

proceeds to determine whether, as applied to Petitioner, he received adequate process in the termination of his parole.

### 2. Petitioner was not afforded adequate process.

Since the Court finds that Petitioner had a protected liberty interest, the Court must examine the adequacy of the procedure to ensure that the deprivation meets the demands of the Constitution. *See Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989). In analyzing what process is due, courts must analyze "the governmental and private interests that are affected." *United States v. Muhtorov*, 20 F.4th 558, 624 (10th Cir. 2021) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976)). Courts should consider the following three factors: (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value of additional procedural safeguards; and (3) the Government's interest, such as the function involved, and the fiscal and administrative burdens additional safeguards would entail. *Mathew*s, 424 U.S. at 335.

As to the first *Mathews* factor, even assuming Petitioner's interest only extends as far as Congress authorized, Petitioner still has a substantial interest in his parole being terminated in accordance with regulatory procedures. Termination upon written notice to the noncitizen after one of the specified determinations in 8 C.F.R. § 212.5(e)(2)(i) is the only procedural safeguard. *See United States v. Lagarda-Aguilar*, 617 F.2d 527, 528 (10th Cir. 1980) (holding that because the "requirement of written notice is the only safeguard . . . . [W]ritten notice is essential to effectuate a termination"). The *Lagarda-Aguilar* court found that the identical phrase, "parole shall be terminated upon written notice to the alien," from 8 C.F.R. § 212.5(b) (1979) "virtually compels [the conclusion] that . . . there must be written notice of parole termination." *Id.* BIA precedent, dealing with the 1979 version of 8 C.F.R. § 212.5, provides that "an alien is entitled to written

notice of termination of parole prior to the institution of exclusion proceedings." *In re. O*, 16 I. & N. Dec. 344, 353 (B.I.A. 1977) (finding that the "regulation in question is clear. . . . [A]liens are entitled to written notice of termination of their parole prior to the institution of exclusion proceedings"). Further, without ever receiving written notice that explained a basis for terminating his parole, Petitioner had no opportunity to be heard at all. Even under the minimal procedural safeguards, Petitioner is afforded the right to notice for an "opportunity to be heard at a meaningful time and in a meaningful manner." *Sosa-Valenzuela*, 692 F.3d at 1112. Petitioner's liberty interest in receiving notice prior to termination pursuant to 8 C.F.R. § 212.5 is particularly salient because notice is the only procedural safeguard that Congress put in place to protect his parole. Therefore, the first *Mathews* factor weighs in Petitioner's favor.

The second *Mathews* factor also weighs heavily in favor of Petitioner. There is a great risk of erroneous deprivation of Petitioner's liberty and parole given that he was neither provided written notice nor a basis for the termination of his parole. Since Petitioner's parole did not terminate automatically before his arrest, written notice was the only procedural safeguard provided beyond the determinations that need to be made by a designated official. *See* § 212.5(e)(2). Without providing Petitioner any written notice that explains a basis for terminating his parole, there exists a great risk of erroneous deprivation. The promulgated regulations do not provide for any procedure to challenge the termination of parole once it has been terminated. *See id.* § 212.5(e). Thus, the absence of any formal procedure to challenge parole termination renders the written notice requirement exceedingly important. Further, courts have found that parole does not terminate without written notice—actualizing the risk of erroneous deprivation as Petitioner was detained while he was still entitled to parole. *See Lagarda-Aguilar*, 617 F.2d at 528; *In re. O*, 16 I. & N. at 353. The value of adhering to the regulatory safeguard—providing written notice—

19

is very high. Because there are no other formal mechanisms for review or opportunities to be heard, written notice provides immense value to a noncitizen. Thus, the Court finds that the second *Mathews* factor weighs in favor of Petitioner.

The final *Mathews* factor, the Government's interest and fiscal or administrative concerns in using an additional safeguard, also weighs in favor of Petitioner. Respondents undoubtedly have an interest in enforcing their immigration policies. However, adhering to the only procedural safeguard authorized by Congress, the written notice requirement, would not cause substantial fiscal or administrative concerns. Respondents' interest in detaining Petitioner would not be substantively hindered, fiscally or administratively, by simply providing Petitioner written notice in accordance with § 212.5(e)(2)(i). The Court does not wade into the dispute about how detailed or individualized such notice must be, which would affect the Court's view of the fiscal and administrative concerns, but the Court does find that some semblance of notice must be provided. None has been provided here.

Accordingly, the Court finds that all three *Mathews* factors weigh in favor of Petitioner, and he has not been afforded adequate process, even under his limited procedural due process rights.

Further, the Court does not find that this case is factually distinguishable from its prior decision in *Alcide v. de Anda-Ybarra*, No. 1:26-cv-00249-KWR-GBW, 2026 WL 622663 (D.N.M. Mar. 5, 2026). This case does not turn on Petitioner's method of arrival, the 2021 NTA, or the papers served to Petitioner following his July 2025 arrest. Additionally, the Court's ruling adopting the PFRD do not improperly question DHS's decision to terminate parole. Rather, the Court finds that Respondents violated Petitioner's due process rights for failure to notify him that his parole was terminated. As such, the Court overrules Respondents' fifth and sixth objections to the PFRD.

20

#### D.    Only release provides a sufficient remedy.

The PFRD recommended release as the appropriate remedy for Respondents' failure to give notice. *See* Doc. 27 at 16. In making his determination, the Magistrate Judge relied on this Court's decision in *Alcide*, which granted a petitioner's release for violation of his constitutional right to procedural due process. The Court agrees that release is also warranted here.

In essence, habeas is "a remedy for unlawful executive detention. The typical remedy is, of course, release." *Munaf v. Geren*, 553 U.S. 674, 693 (2008). Federal district courts have broad equitable powers to craft habeas relief. *Burton v. Johnson*, 975 F.2d 690, 693 (10th Cir. 1992). District courts have the power and authority to dispose of habeas corpus matters "as law and justice require." 28 U.S.C. § 2243.

Again, there is no evidence in the record demonstrating that Petitioner's § 1182 parole had been properly terminated. Respondents represent that the documents on the record were the only documents given to Petitioner in July 2025. Ordering a bond hearing, which Respondents argue that Petitioner is not entitled to, cannot cure the fact that he is detained while his §1182 parole is still ongoing because it has not been properly terminated. Release is required to remedy the ongoing due process violation caused by Petitioner's detention while his conditional parole has not yet been terminated. The Court does not see how ordering a bond hearing would remedy a wrong that has been ongoing since the outset of Petitioner's detention. Therefore, the appropriate remedy is release.

## II.    Petitioner is detained pursuant to § 1226(a), not § 1225(b).

As Respondents point out, the PFRD's ruling on notice could result in a situation where Petitioner could be detained "within minutes or hours after being released, albeit with the 'right' papers being served on Petitioner." Doc. 28 at 8. Since Petitioners raise this potential scenario, the

21

Court will address the issue of which statutory authority governs Petitioner's current detention should Respondents later re-detain him. For the reasons below, the Court finds that § 1226 governs Petitioner's current detention and will govern any future detention.

Respondents object to the Magistrate Judge's recommendation that Petitioner's original detention in 2021 was pursuant to § 1225(b)(2) and contend that Petitioner's detention is governed by § 1125(b)(1) since his proceedings were initially governed by § 1225(b)(1), he was paroled, and now his proceedings are once again governed by § 1225(b)(1). Doc. 28 at 1–2. The Court disagrees and overrules Respondents' first and second objections to the PFRD.

Section 1225(b)(1)(A)(i) provides that "[i]f an immigration officer determines that an alien . . . who is arriving in the United States . . . is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title, the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i). This is commonly referred to as expedited removal. "An applicant is subject to expedited removal if, as relevant here, the applicant (1) is inadmissible because he or she lacks a valid entry document; (2) has not 'been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility'; and (3) is among those whom the Secretary of Homeland Security has designated for expedited removal. §§ 1225(b)(1)(A)(i), (iii)(I)–(II)." *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 109 (2020). Noncitizens subject to § 1225(b)(1) potentially face mandatory detention. § 1225(b)(1)(B)(ii), (iii)(IV).

The PFRD focused its inquiry on whether Petitioner was "inspected" under § 1225(b)(2). Doc. 27 at 9–12. However, the Court finds that the necessary inquiry does not turn on the statutory meaning of "inspection." Instead, the removal proceedings initiated against Petitioner, and the type

22

of parole initially granted in 2021, dictate the outcome. As a result, the Court will not address Respondents' third and fourth objections to the PFRD.

When Petitioner was arrested, briefly detained, and released in 2021, he was served an NTA. The 2021 NTA was issued pursuant to section 240 of the INA, *see* Doc. 9-2, which initiated regular removal proceedings under 8 U.S.C. § 1229a, not expedited removal proceedings under 8 U.S.C. § 1225(b)(1). It also designated Petitioner as a noncitizen "present in the United States who has not been admitted or paroled," not as an "arriving alien." *Id.* Accordingly, the record contradicts Respondents' assertion that Petitioner was processed in 2021 under § 1225(b)(1). Further, § 1225(b)(1) does not govern Petitioner's initial treatment simply because he was detained near the United States–Mexio border. *See* Doc. 28 at 2. Logically, then, Petitioner's detention would be governed by either § 1225(b)(2) as an applicant for admission seeking admission or under § 1226(a).

To the extent that Respondents argue that Petitioner was still subject to § 1225(b)(2) at the time of his July 2025 detention, the Court disagrees. The record demonstrates that Petitioner was released on conditional parole under § 1226(a)(2)(B), not parole under § 1182. Thus, in 2021, DHS classified Petitioner as subject to § 1226, not § 1225.

The Court reaches this conclusion because the record demonstrates that Petitioner was released on recognizance in 2021. Release on recognizance is not categorized as "humanitarian" or "public benefit" parole under 8 U.S.C. § 1182(d)(5)(A). Instead, release on recognizance is a form of conditional parole, governed by § 1226(a). *See Matter of Cabrera-Fernandez*, 28 I. & N. Dec. 747, 747 (B.I.A. 2023) ("[They were] released on their own recognizance pursuant to DHS' conditional parole authority under . . . 8 U.S.C. § 1226(a)(2)(B)."); *Ortega-Cervantes v. Gonzales*,

501 F.3d 1111, 1115 (9th Cir. 2007) ("It is apparent that the . . . phrase 'release on recognizance' [is] another name for 'conditional parole' under § 1226(a).").

Here, Respondents stated that "U.S. Border Patrol released Petitioner on his own recognizance (NTA-OR) for humanitarian reasons." Doc. 9 at 3. Petitioner's release on recognizance was also mentioned in the 2021 Form I-213. Doc. 9-3. The 2021 NTA further confirms that Petitioner was released on conditional parole since officers indicated that Petitioner had not been paroled after inspection by an immigration officer. *See* Doc. 9-2. Therefore, although Petitioner may have been released for humanitarian purposes in 2021, DHS granted him release in the form of conditional parole, not parole.

As a result, Petitioner's conditional parole classified him as subject to § 1226 in 2021, and § 1225 could not have governed Petitioner's detention more than three years later. *See Matter of M-S-*, 27 I. & N. Dec. 509, 516 (Att'y Gen. 2019) ("Yet [§ 1225] (under which detention is mandatory) and [§ 1226(a)] (under which detention is permissive) can be reconciled only if they apply to different classes of aliens."); *see also Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 485 (S.D.N.Y. 2025) (noting that the respondents did not "dispute that [§§ 1225 and 1226] . . . are mutually exclusive").

Even if Petitioner could be classified under both § 1225(b)(2) and § 1226(a), Petitioner, who had been present in the United States for over three years before his July 2025 detention, could not be deemed "seeking admission" under § 1225(b)(2)(A) in 2025. As this Court determined in *Sanju v. Castro*, No. 2:26-cv-00497-KWR-JMR, 2026 WL 1146639, at *5 (D.N.M. Apr. 28, 2026), a petitioner who has been continually present in the United States at the time of his arrest, and who was not seeking lawful, physical entry into the country at that time, cannot be deemed "seeking admission" under § 1225(b)(2). Thus, consistent with the Court's reasoning in

24

*Sanju*, which the Court adopts and incorporates herein, § 1225(b)(2) could not govern Petitioner's detention.

Finally, the 2024 grant of § 1182 parole could not have "turned back the clock" such that Petitioner's current detention is now governed by § 1225(b)(1). As this Court has determined, once § 1182 parole is terminated, a petitioner is returned to the legal status held at the time that parole was granted. *Diaz. v. Mullin*, No. 2:26-cv-00639-KWR-JHR, 2026 WL 1481585, at * 14 (D.N.M. May 27, 2026). By 2024, DHS had already treated Petitioner as subject to proceedings under § 1226(a). Accordingly, consistent with the Court's reasoning in *Diaz*, which the Court adopts and incorporates herein, Petitioner's legal status was governed by § 1226 when he was granted § 1182 parole in 2024. Even if Petitioner's parole had been properly terminated, his status would have returned to § 1226 once removal proceedings resumed and he was detained.

Thus, the Court finds that Petitioner is currently detained under § 1226, and § 1226 will govern any future detention. The Court overrules Respondents' first and second objections to the PFRD.

## CONCLUSION

As explained above, the Court concludes that Respondents violated Petitioner's due process rights for failure to properly terminate his parole granted under 8 U.S.C. § 1182. Therefore, Petitioner shall be immediately released under the same conditions of supervision he was subject to prior to his detention. If Petitioner is subsequently re-detained, Respondents may not re-detain him pursuant to § 1225(b) and must provide him with a prompt bond hearing pursuant to § 1226(a).

25

The parties are ordered to file a status report within **three (3) days** of the entry of this order. The Court will enter a separate judgment.[2]

  **IT IS THEREFORE ORDERED** that Petitioner's Amended Petition (Doc. 3) is hereby **GRANTED in part** for the reasons described in this Memorandum Opinion and Order.

  **IT IS FURTHER ORDERED** that the Proposed Findings and Recommended Disposition (Doc. 27) are **ADOPTED** in part and **REJECTED** in part.

  **IT IS FURTHER ORDERED** that Respondents shall immediately release Petitioner under the same conditions of supervision he was subject to prior to his detention.

  **IT IS FINALLY ORDERED** that the parties are directed to file a joint status report within **three (3) days** of the entry of this order.


             _____/S/_____
             KEA W. RIGGS
             UNITED STATES DISTRICT JUDGE

---

[2] The Court need not delay entry of judgment to wait for Respondents to comply with the Court's order. The Court "always retains jurisdiction to enforce its lawful judgments, including habeas judgments." *Gall v. Scroggy*, 603 F.3d 346, 352 (6th Cir. 2010); *Burton v. Johnson*, 975 F.2d 690, 693 (10th Cir. 1992) (explaining that district court has authority to enforce its habeas judgment).

26